# United States District Court
# Northern District of Indiana

| | |
|---|---|
| SSC OPERATING LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SHERIFF OF TIPPECANOE COUNTY, )<br>INDIANA, TRACY BROWN; CASSIDY )<br>TURLEY COMMERCIAL REAL ESTATE )<br>SERVICES INC. d/b/a CASSIDY TURLEY )<br>AUCTION SERVICES; and RBS CITIZENS )<br>NATIONAL ASSOCIATION d/b/a CHARTER )<br>ONE; )<br>)<br>Defendants. )<br>_____)<br>RBS CITIZENS NATIONAL ASSOCIATION )<br>d/b/a CHARTER ONE, )<br>)<br>Counterclaimant )<br>)<br>v. )<br>)<br>SSC OPERATING LLC, )<br>)<br>Counter Defendant )<br>_____)<br>RBS CITIZENS NATIONAL ASSOCIATION )<br>d/b/a CHARTER ONE, )<br>)<br>Third-Party Plaintiff, )<br>)<br>v. )<br>)<br>MATTHEW G. GARRISON and MARCUS )<br>R. MUINZER, )<br>)<br>Third-Party Defendants. ) | Civil Action No. 4:12-CV-72 JVB |

**OPINION & ORDER**

Plaintiff, SSC Operating, LLC (SSC), filed a Complaint for Declaratory Relief and Damages against Defendant, RBS Citizens National Association (RBS), over sheriff's auction of real estate that was allegedly improperly executed. Previous to this filing, RBS foreclosed on a parcel of commercial property (Property) that was used as collateral for security agreements RBS held. This foreclosure action was the impetus for a sheriff's auction of the Property, which SSC bid on at auction. After the auction closed, SSC was informed that it submitted the highest bid, but then uncovered alleged irregularities with both the Property and the sheriff's sale. As a result of these discoveries, SSC notified RBS that it was rescinding its offer. SSC maintains that no contract was ever formed for the purchase of the Property since RBS did not relay its acceptance of SSC's bid prior to revocation. SSC, through its Complaint for Declaratory Relief, is seeking either the return of its earnest money deposit, because it never entered into an enforceable contract, or a judgment that sets aside the sheriff's sale on the basis of procedural irregularities. Alternatively, if the Court finds a contract did exist, SSC asks the Court to limit damages to the earnest money deposit. RBS filed a counterclaim alleging that SSC breached its contract to purchase the Property and a Third Party Complaint against Matthew Garrison and Marcus Muinzer, Third-Party Defendants and members of SSC, to pierce the corporate veil and hold them liable in their personal capacities for the alleged breach of contract.

**A. Background**

On November 10, 2011, RBS sued in Tippecanoe County Circuit Court to foreclose security agreements it had issued to Midwest Commercial Investments, IV, LLC. (DE 104, Joint Statement at ¶ 20, 23.) The collateral for these security agreements was a parcel of commercial property in Lafayette, Indiana. (*Id*. at ¶ 18.) RBS and Midwest Commercial Investments jointly

moved for summary judgment in the foreclosure action, which was granted on June 27, 2012. (*Id*. at ¶ 34–35.) The stipulated summary judgment order directed the Tippecanoe County Sheriff to sell the Property pursuant to Indiana Code § 32-29-7-4 and directed that unpaid real estate taxes in the amount of $690,735.43 be paid from proceeds of the sale. (*Id*. at ¶ 18, 38.)

Tracy Brown, the Tippecanoe County Sheriff, was responsible for executing the sheriff's sale. However, four other individuals played more significant roles in managing the Property and preparing for the auction. Kevin Bol was appointed by the Tippecanoe County Circuit Court to serve as the Receiver for the Property during the pendency of the foreclosure proceedings and auction. (*Id*. at ¶ 24, 26.) As the Receiver, Bol was responsible for managing the bills, leases, tenants, and accounts associated with the property, as well as preparing the due diligence packet that would be provided to potential purchasers of the Property. (*Id*. at ¶ 30–33, 86.) Bol then retained Jennie Kirby, who served as the manager of the Property for Midwest Commercial Investments, to manage the Property until the auction and subsequent transfer of ownership occurred. (*Id*. at ¶ 18, 32.) James Getts, the Director of Auction Services for Cassidy Turley Commercial Real Estate Services, was responsible for advertising, marketing, and selling the Property "in a manner calculated to bring the highest and best price." (*Id*. at ¶ 12, 42–44.) Brian Pollack, the RBS vice-president responsible for troubled assets, was also deeply involved in the foreclosure and auction. (*Id*. at ¶ 14–17.) Mr. Pollack received periodic updates from Mr. Bol as the auction neared, chose Cassidy Turley to manage the auction, and was involved with preparing for the auction alongside Bol and Getts. (*Id*. at ¶ 33, 40, 78.)

Getts, in his role as the auctioneer, publicized the auction of the Property in two ways. First, he published a brochure that outlined the broad strokes of the auction. The brochure declared that the Property had an occupancy rate of over seventy percent and that a due diligence package was available for review on his company's website. (*Id*. at ¶ 124–125.) The brochure

also described the sealed bidding process, which required prospective purchasers to submit an offer in a sealed envelope by 2:00 p.m., on October 24, 2012. (*Id*. at ¶ 125–126.) The brochure required each bidder to submit a $100,000 earnest money deposit and the winner of the sealed auction would be required to submit additional funds to bring the deposit to 10% of the purchase price within five days after the bid was accepted. (*Id*. at ¶ 127.) The brochure assured prospective buyers that a sheriff's deed would be delivered at closing and that "[e]ach potential bidder is responsible for conducting their own independent inspections, investigations, inquiries and due diligence concerning the property." (*Id*. at ¶ 128, 132.) These same terms, among others, were all encapsulated in a Terms of Sale and Contract (Terms of Sale) that prospective bidders utilized to submit their bids. (DE 108-3, at 3–6.) Second, Getts received a copy of the due diligence package prepared by Mr. Bol and posted it on the Property's auction website. Getts admits that he did not review the due diligence materials for accuracy or completeness before making it available. (Id. at ¶ 87–91.)

SSC submitted a bid of $3,510,000 to purchase the Property, which was the highest of the four bids Getts received before the auction closed on October 24, 2012. (DE 104, Joint Statement at ¶ 170–177.) On October 24, 2012, after reviewing the bids, Getts informed Pollack of SSC's bid and Pollack responded that RBS would accept the bid once SSC deposited its $100,000 in earnest money. (*Id.* at ¶ 178–179.) Bol, without notifying SSC that it was the highest bidder, directed SSC to submit its earnest money, which it did by cashier's check later that same afternoon. (*Id.* at ¶ 180–181.) In a subsequent phone call confirming the receipt of SSC's earnest money, Bol recommended that Muinzer contact Jennie Kirby to discuss the Property. (*Id.* at ¶ 184.) Later that same afternoon, Getts called Muinzer and informed him that SSC's bid was the highest one received. (*Id.* at ¶ 186.)

That evening, Muinzer contacted Kirby and discussed the Property for five to ten minutes. (*Id.* at ¶ 187.) Kirby remembers the conversation as being generally positive in tone and Muinzer indicated that she would continue to manage the Property on SSC's behalf. (*Id.* at ¶ 188, 189.) During this conversation, Muinzer learned that: (1) Kirby was part of a group that had submitted a competing bid of $2,050,000; (2) one tenant was over $100,000 in arrears on rent; (3) two large tenants had expressed an intent to relocate; and (4) the Property had a $700,000 property tax arrearage that had not been extinguished prior to the auction. (DE 114, Mem. at 11; DE 104, Joint Statement at ¶ 187–190.) SSC, Garrison, and Muinzer maintain that none of these facts were disclosed in the due diligence package. On the basis of this conversation, Muinzer speculated that the due diligence materials overestimated the annual rent collected at the property by $360,000 and unsuccessfully tried to contact Getts that evening to discuss this alleged discrepancy. (DE 104, Joint Statement at ¶ 191–192.)

The following morning, Kirby emailed Muinzer financial documents for the Property. (*Id.* at ¶ 194.) Kirby closed her email by letting Muinzer know that she was looking forward to working with him and was prepared to provide any further information he needed or answer any of his questions. (*Id.*) Eleven minutes after receiving Kirby's email, at 8:54 a.m., Muinzer emailed Getts to revoke SSC's previously submitted bid. (*Id.* at ¶ 194.) Muinzer's email to Getts stated:

> Bob we are officially withdrawing our offer and have cancelled the cashiers check for $100,000. As of now, we have still never seen an executed copy sign[ed] by seller even after multiple calls and emails to you asking you to contact me regarding the deal. Marc

(*Id.* at ¶ 196.)

Getts and Pollack concede that a fully executed copy of SSC's bid was not sent to SSC prior to receiving the above email from Muinzer. (*Id.* at ¶ 201–203.)

On November 15, 2012, three weeks after the auction, SSC re-tendered its $100,000 earnest money check, plus interest, to the title company handling the auction. (Id. at ¶ 208.) Then, on November 27, 2012, SSC's counsel emailed RBS and explained that they would not close at the original bid price of $3,510,000, but would close at $2,750,000. (*Id.* at ¶ 209.) SSC's counsel specified that this new offer was a "backup bid for the original sale." (*Id.*) RBS did not accept SSC's new offer and the Property was subsequently sold at a second auction for $3,000,000. (*Id.* at ¶ 211, 216, 221.) SSC did not bid at the second auction and the winning bid was submitted by a group of investors that included Jennie Kirby. (*Id.* at ¶ 220–221.)

### B. Procedural History

SSC's four count Complaint for Declaratory Relief and Damages argues that it never entered into a contract to purchase the Property and RBS unjustly enriched itself by retaining its second earnest money deposit of $101,135. In its second count, SSC urges the Court to set aside the first sheriff's sale on account of fraud, procedural irregularities, inequitable conduct, mistake, misapprehension, or great unfairness. Alternatively, if the Court finds SSC liable for breach of contract, SSC urges the Court to limit damages solely to the forfeiture of the $101,135 earnest money deposit, which is currently being held in escrow with the title company. Lastly, SSC urges the Court to find the remedies listed in the Indiana sheriff's sale statute, Indiana Code § 32-29-7-9, inapplicable since the auction did not adhere to the statute.

RBS responded by filing a counterclaim against SSC and a Third Party Complaint against Muinzer and Garrison. In its counterclaim, RBS asserts that SSC breached its contract to purchase the Property, thus entitling RBS to the difference between SSC's original bid of $3,510,000, and the eventual sale price of $3,000,000. In its Third Party Complaint, RBS

contends that the Court should pierce the corporate veil of SSC and hold Garrison and Muinzer personally liable for the alleged breach of contract.

RBS filed the first of four summary judgment motions in this case. (DE 111, Mot. Summ. J.) RBS contends that it is entitled to summary judgment on its counterclaim for breach of contract and the resultant damages of $510,000. Next, SSC filed a motion for summary judgment on its four count Complaint for Declaratory Relief. (DE 113, Mot. Summ J.) SSC maintains that it is entitled to the return of its earnest money deposit because it withdrew its bid prior to acceptance and irregularities and fraud surrounding the auction should lead the Court to set aside the sale. The third motion for summary judgment was filed by Garrison and Muinzer, in their individual capacities, to address RBS' Third Party Complaint. (DE 115, Mot. Summ. J.) The fourth motion for summary judgment was filed by SSC to address RBS' counterclaim. (DE 116, Mot. Summ. J.)

### C. Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id*. at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*. at 323, 325; *Keri v. Bd. of Trust. of Purdue Univ*., 458 F.3d 620, 628 (7th Cir. 2006); *Green v. Whiteco Indus., Inc*., 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi*., 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Keri*, 458 F.3d at 628; *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Keri*, 458 F.3d at 628; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue

for trial. *Keri*, 458 F.3d at 628; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Comm., Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

As described above, summary judgment is only appropriate by the terms of Rule 56(c) where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. Mindful of these standards, the court now turns to the substance of the parties' motions.

**D. Analysis**

In this case, the Court must address two threshold questions. First, the Court must determine whether a contract was formed as a result of the bid submitted by SSC during the auction. Second, the Court must determine whether the sheriff's sale should be set aside because the sale did not adhere to the process articulated in Indiana Code § 32-29-7-1 *et seq.*, or vacated on the basis of alleged material non-disclosures by RBS and its agents. If there was a contract and the sale is not set aside, the Court must then determine whether RBS is entitled to maintain a breach of contract claim as a third party beneficiary and, if so, the proper damages award. If the sale is vacated or no contract was formed, then RBS is not entitled to damages and SSC's earnest money should be returned.

SSC maintains that a contract was never formed to purchase the Property because RBS failed to communicate its acceptance of SSC's bid prior to Muinzer's email revoking the bid. RBS counters that Getts notified SSC of RBS' acceptance of its offer on October 24, 2012, when he relayed to Muinzer that SSC had submitted the highest bid. The Court finds that RBS' acceptance of the bid was never communicated to SSC prior to revocation. Accordingly, SSC never entered into a contract to purchase the property and is entitled to the return of its earnest money deposit.

An offer, acceptance, consideration, and a manifestation of mutual assent establish the existence of a contract. *Ind. BMV v. Ash, Inc.*, 895 N.E.2d 359, 365 (Ind. Ct. App. 2008). For a contract to exist, "an offer must be extended and the offeree must accept it, the communication of acceptance being crucial." *Id*. Consequently, a meeting of the minds between the contracting parties is essential to the formation of a contract. *Id.* A mutual assent on all essential elements or terms of a contract must exist in order to form a binding contract. *Homer v. Burman*, 743 N.E.2d

1144, 1146–47 (Ind. Ct. App. 2001). However, "assent to those terms of a contract may be expressed by acts which manifest acceptance." *Id*.

Neither party disputes that SSC made an offer on the Property when it delivered its bid of $3,510,000 to Getts during the auction. Therefore, the Court's analysis focuses on the acceptance of the offer, communication of the acceptance, and whether a meeting of the minds occurred.

As stated previously, the Terms of Sale required RBS to accept the SSC's bid to create a contract to purchase the Property. At the close of the auction, Getts reviewed the bids and relayed to Pollack that SSC was the high bidder. (DE 104, Joint Statement at ¶ 178.) In turn, Pollack relayed to Getts that RBS would accept SSC's offer once the earnest money was deposited. (*Id.* at ¶ 179.) After SSC deposited its earnest money, Getts called Muinzer and informed him that SSC was the high bidder at the auction, but did not relay Pollack's statement regarding RBS' acceptance of SSC's bid. (*Id.* at ¶ 186.) This discussion between Muinzer and Getts, the contents of which are undisputed, does not demonstrate that RBS' acceptance of SSC's offer was communicated to SSC.

According to the Terms of Sale, Getts, as an employee of the auction company, is an "Agent for the Seller exclusively." (DE 18, Ex. 1 at ¶ 2.) This language indicates that Getts has authority to speak and act on behalf of the Tippecanoe County Sheriff, but not RBS. In fact, the conversation between Getts and Muinzer supports this understanding of Getts' role in the sale. All parties agree that Getts called Muinzer and relayed that SSC was the highest bidder or the winning bidder. (DE 104, Joint Statement at ¶ 186.) However, neither side asserts that Getts informed Muinzer that RBS had accepted SSC's offer. Muinzer was understandably excited to learn this news, but this does not automatically entail that a contract was formed. Instead, this indicated to Muinzer and SSC that RBS was reviewing its bid.

11

SSC, Garrison, and Muinzer also maintain that no one from RBS communicated acceptance of SSC's offer. In support, SSC highlights that neither it, nor any of its agents, received a copy of the Terms of Sale signed by RBS before Muinzer emailed SSC's notice of revocation. Moreover, neither Pollack, nor any other employee of RBS, claims to have contacted SSC and communicated RBS' acceptance of its offer. RBS' failure to communicate acceptance to SSC was further evidenced by Pollack's email to Getts and Bol after learning of SSC's revocation. Pollack asked Getts and Bol, "[d]id Muinzer get a copy of the signed contract? Get that [earnest money] check deposited!!!!" (DE 104, Joint Statement at ¶ 198.) This exchange between Getts, Bol, and Pollack further supports SSC's contention that acceptance of its offer by RBS was not communicated prior to revocation.

RBS persists in its claim that Getts communicated the Sheriff's acceptance of its bid and this occurrence established a contract amongst the parties. (DE 122, Resp., at 6.) But, this contention is unsupported by the Terms of Sale. Since RBS included a reserve in the Terms of Sale, thus maintaining its ability to approve any bid, the Sheriff's acceptance of a bid is almost meaningless. While Muinzer was justifiably excited when he heard SSC's bid was the highest, this fact did not guarantee that the bid would be accepted by RBS. No sale could occur until RBS accepted a bid and communicated its acceptance to SSC. That did not happen in this case. Accordingly, the Court finds that no contract was formed between the parties prior to SSC's revocation of its offer. The Court does not address the issue of whether procedural irregularities or a failure to disclose warrant setting aside the sale because that issue is rendered moot.

### E. Conclusion

For the reasons outlined above, the Court:

(1) DENIES RBS' Motion for Summary Judgment (DE 111);

(2) GRANTS IN PART and DENIES IN PART SSC's Motion for Summary Judgment (DE 113). The Court GRANTS SSC's Motion as it addresses the absence of a contract for SSC to purchase the Property and DENIES SSC's Motion in all other respects;

(3) GRANTS Third Party Defendants' Motion for Summary Judgment (DE 115) as it addresses the piercing the corporate veil claim to hold Garrison and Muinzer personally liable;

(4) GRANTS SSC's Motion for Summary Judgment (DE 116) as it addresses RBS' counterclaim; and

(5) DENIES as moot all of the parties' Motions to Strike (DE 121, 123, 130, 131, and 132.).

**SO ORDERED** on July 9, 2015.

 s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT